IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **RONALD R. PHILLIPS**, <br> Inmate No. 279-109 <br> Chillicothe Correctional Inst. <br> 15802 State Route 104 North, <br> Chillicothe, Ohio  45601, <br><br> **GRADY BRINKLEY,** <br> Inmate No. 436-028 <br> Chillicothe Correctional Inst. <br> 15802 State Route 104 North, <br> Chillicothe, Ohio 45601, <br><br> **RAYMOND TIBBETTS,** <br> Inmate No. 363-178 <br> Chillicothe Correctional Inst. <br> 15802 State Route 104 North, <br> Chillicothe, Ohio  45601, <br><br> and <br><br> **ROBERT VAN HOOK,** <br> Inmate No. 186-347 <br> Chillicothe Correctional Inst. <br> 15802 State Route 104 North, <br> Chillicothe, Ohio  45601, <br><br> Plaintiffs, <br><br> vs. <br><br> **MIKE DEWINE**, in his official capacity as the Attorney General of the State of Ohio, <br> 30 E. Broad St., 14th Floor <br> Columbus, Ohio  43215, <br><br> **JOHN KASICH**,  in his official capacity as the Governor of the State of Ohio, <br> Riffe Center, 30th Floor <br> 77 South High Street <br> Columbus, Ohio  43215, | CASE NO. 2:14-cv-02730 <br><br><br><br><br><br><br><br><br><br><br><br> **COMPLAINT FOR EQUITABLE, INJUNCTIVE, AND DECLARATORY RELIEF** <br> _____ |

1

**GARY MOHR**, in his official capacity as )
the Director of the Ohio Department of )
Rehabilitation and Corrections, )
770 West Broad Street )
Columbus, Ohio  43222, )
 )
and )
 )
**DONALD MORGAN**, in his official )
capacity as the Warden of the Southern )
Ohio Correctional Facility )
1724 St. Rt. 728 )
Lucasville, Ohio    45699 )
 )
       Defendants. )

   Plaintiffs Ronald Phillips, Grady Brinkley, Raymond Tibbetts, and Robert Van Hook, by

and through their respective undersigned counsel, and for their complaint against defendants Mike

DeWine, John Kasich, Gary Mohr, and Donald Morgan, allege and aver as follows:

<h3 style="text-align:center"><u>I. SUMMARY OF COMPLAINT</u></h3>

   1.  "A popular Government, without popular information, or the means of acquiring

it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern

ignorance: And a people who mean to be their own Governors, must arm themselves with the

power which knowledge gives."[1]  This action seeks to preserve those founding principles.

   2.  Capital punishment is one of the most debated moral and political issues in this

country's contemporary discourse. As part of a nation that values freedom and limited government,

many Americans question whether the government should have the power to kill any of its citizens

---

[1] Letter from James Madison to W.T. Barry (August 4, 1822), in The Writings of James Madison (Gaillard Hunt ed.) (cited on website of U.S. Justice Department, available at: http://www.justice.gov/oip/blog/foia-post-2008-celebrating-james-madison-and-freedom-information-act#f1). James Madison is the author of the First Amendment. See James Madison's Contribution to the Constitution, America's Story from America's Library, Library of Congress, available at: http://www.americaslibrary.gov/aa/madison/aa_madison_father_3.html.

under any circumstances. Speech opposed to lethal injection as a means of capital punishment has persuaded various actors essential to that process to cease their participation, all of which ultimately benefits Plaintiffs.

3.      To silence one side of this debate and foreclose all effective advocacy, Ohio enacted Substitute House Bill No. 663 (hereinafter "HB 663") to conceal from the public the identities of almost all actors to whom such speech must be directed, and created punitive civil sanctions against those who disclose such information. In doing so, HB 663 offends the most basic free speech rights enshrined in the Ohio and U.S. Constitutions. The challenged restrictions imposed by HB 663 are content- and viewpoint-based restrictions on speech that were adopted in direct response to the use of civil liberties to influence public policy in opposition to the State's favored viewpoint. They also function as an unconstitutional prior restraint.[2]

4.      Because HB 663 withholds information necessary to inform public discourse, it exempts the merits of capital punishment by lethal injection from meaningful consideration. The law will thus arrest the public debate on the merits of the death penalty, artificially suspending the evolving standards of decency that must inform the use of capital punishment in any civilized society.

5.      This action is brought for, among other claims, violations and threatened violations by Defendants of Plaintiffs': (a) First Amendment rights including the right, shared by all citizens, to participate in (and, for Plaintiffs, to also benefit from) speech against capital punishment by lethal injection and engage in an informed public discourse; (b) First Amendment and associated

_____

[2]As addresses more fully *infra*, this Complaint challenges the constitutionality of the following four key provisions of HB 663: (1) compelled secrecy; (2) disciplinary and licensure immunity for licensed professionals involved in lethal injection; (3) sealing of court records and a system of "private hearings"; and (4) civil sanctions for disclosure. They are codified in relevant parts in R.C. §§ 149.43, 2949.221, and 2949.222. These four provisions are hereinafter collectively referred to as "the Challenged Provisions of HB 663." A copy of the enacted bill is attached hereto as Exhibit 1.

due process rights to petition the government for redress of grievances and of access to courts; and (c) First Amendment right, shared by all citizens, of access to governmental proceedings related to the execution of U.S. citizens.

6.     Plaintiffs seek equitable, injunctive, and declaratory relief, including a declaration that the Challenged Provisions of HB 663 are unconstitutional on their face and/or as applied, are invalid, and/or may not take effect. This Complaint does not challenge Plaintiffs' underlying capital convictions or sentences of death, nor does it allege that lethal injection as a form of execution is per se unconstitutional.

## II. PARTIES, JURISDICTION, AND VENUE

7.     Plaintiff Ronald Phillips is a citizen of the State of Ohio.  He is confined on death row at the Chillicothe Correctional Institution ("CCI"), Chillicothe, Ohio, in this judicial district. Phillips is serving a sentence of death for a 1993 conviction for aggravated murder with a capital specification.  He has been on death row for 21 years.

8.     Phillips is currently scheduled to be executed by lethal injection on February 11, 2015. Phillips believes, and therefore alleges, that if the State goes forward with his execution on February 11, 2015, or on some later date, and if it intends to use pentobarbital as the execution drug, it intends to use compounded pentobarbital obtained from a compounding pharmacy or pharmacist.

9.     Plaintiff Grady Brinkley is a citizen of the State of Ohio. He is confined on death row at CCI. Brinkley is serving a sentence of death for a 2002 conviction for aggravated murder with capital specifications. He has been on death row for 12 years. He does not yet have an execution date.

10. Plaintiff Raymond Tibbetts is a citizen of the State of Ohio. He is confined on death row at CCI. Tibbetts is serving a sentence of death for a 1998 conviction for aggravated murder with a capital specification. He has been on death row for 16 years.

11. Tibbetts is currently scheduled to be executed by lethal injection on March 12, 2015. Tibbetts believes, and therefore alleges, that if the State goes forward with his execution on March 12, 2015, or on some later date, and if it intends to use pentobarbital as the execution drug, it intends to use compounded pentobarbital obtained from a compounding pharmacy or pharmacist.

12. Plaintiff Robert Van Hook is a citizen of the State of Ohio. He is confined on death row at CCI. Van Hook is serving a sentence of death for a 1985 conviction for aggravated murder with a capital specification. He has been on death row for 29 years.

13. Van Hook is currently scheduled to be executed by lethal injection on November 17, 2015. Van Hook believes, and therefore alleges, that if the State goes forward with his execution on November 17, 2015, or on some later date, and if it intends to use pentobarbital as the execution drug, it intends to use compounded pentobarbital obtained from a compounding pharmacy or pharmacist.

14. Defendant Mike DeWine is the Attorney General of the State of Ohio and chief legal officer. He is charged with enforcing HB 663, codified in relevant part at Ohio Rev. Code §§ 149.43, 2949.221, and 2949.222. Attorney General DeWine is sued in his official capacity.

15. Defendant John Kasich is the Governor of the State of Ohio and the State's chief executive officer. The Ohio Department of Rehabilitation and Corrections ("DRC"), the agency charged with various tasks and duties concerning the administration and implementation of HB 663, codified in relevant part at Ohio Rev. Code §§ 149.43, 2949.221, and 2949.222, is an executive branch agency. Kasich is also statutorily and constitutionally responsible for carrying

out of all death sentences in Ohio and the manner in which those sentences are executed. Governor Kasich is sued in his official capacity.

16.     Defendant Gary Mohr is the Director of DRC, a department of the State of Ohio that was created and is maintained pursuant to Ohio Rev. Code § 5120. Defendant Mohr is the executive officer charged with responsibility for the management of DRC, and is charged and authorized under Ohio Rev. Code § 5120.01 to prescribe and direct the promulgation of rules and regulations for DRC, including the rules and regulations for the conduct of prison operations and execution procedures. DRC is also charged with various tasks and duties concerning the administration and implementation of HB 663, codified in relevant part at Ohio Rev. Code §§ 149.43, 2949.221, and 2949.222, including the promulgation of rules and procedures required by HB 663. Director Mohr is sued in his official capacity.

17.     Defendant Donald Morgan is Warden of the Southern Ohio Correctional Facility ("SOCF"), a correctional institution of DRC that was created and is maintained pursuant to Ohio Rev. Code § 5120.05. SOCF is the prison where Ohio carries out its death sentences. Pursuant to Ohio Rev. Code § 5120.38, Defendant Morgan, as the Warden of SOCF, is charged with management of SOCF and the oversight and conduct of operations at SOCF, including executions carried out there. He is sued here in his official capacity.

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil-rights violations), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief). Plaintiffs invoke this Court's jurisdiction pursuant to Article III of the United States Constitution, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b). Plaintiffs are currently incarcerated at CCI in this judicial district. All executions conducted by DRC occur at SOCF,

6

Lucasville, Ohio, also in this judicial district. The events giving rise to this Complaint have occurred and/or will occur in this judicial district.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.     Exhaustion is not necessary under the Prison Litigation Reform Act, 42 U.S.C. § 1997e, because this suit does not challenge prison conditions, and because there are no available administrative remedies that could address the challenged constitutional violations concerning HB 663.

## IV. BACKGROUND FACTS APPLICABLE TO ALL COUNTS

### A. The Death Penalty is One of the Most Widely Debated Issues of Our Day, One That Spurs Debate and Activism on Both Sides.

21.     The death penalty is one of the most debated moral and political issues in all of contemporary discourse, a question touching profound ideas in philosophy and theology.

22.     People have strong opinions, for and against the death penalty, and the Ohio and U.S. Constitutions firmly protect their rights to express those opinions, and to engage in lawful speech on all sides of the debate.

23.     Many of those opposed to capital punishment believe it is immoral, unjust, and/or inhumane for a government to kill one of its own citizens for committing a crime. Many also believe it is equally wrong for governments to use the tools of medicine and the healing arts in doing so. And many believe that it is immoral, unjust, and wrong for physicians, nurses, pharmacists, and other medical professionals engaged in professions that are committed to saving and enhancing lives (and who receive licenses from the State to engage in such professions), to be involved or provide advice and assistance in the state-sanctioned killings of other human beings.

24.     Plaintiffs believe, and therefore allege, that such views in opposition to capital punishment are firmly held by a large cross-section of the community, both in this State and across the United States.

25.     Plaintiffs also believe, and therefore allege, that there are many people with such views in opposition to capital punishment and lethal injection, in Ohio and across the United States, who are willing to and actually do express those views in public forums and in pursuit of advocacy against the death penalty. These views are often expressed in letters to newspapers, by protesting and/or leafleting at execution sites and at other public places, and by lobbying legislators and other elected officials through phone calls and letters. Many also seek to educate and persuade those directly and indirectly involved in carrying out death sentences that such activity, even if legal, is nonetheless immoral, unjust, inhumane, and contrary to the standards, ethics, and ideals of their industries and/or professions, and should not occur.

26.     Death row inmates, like Plaintiffs, also engage in speech that draws attention to their belief that the death penalty by lethal injection is cruel and inhumane. These inmates do so by bringing and conducting litigation against the constitutionality of lethal injection protocols, procedures, and practices. Phillips, Brinkley, Tibbetts, and Van Hook, among other Ohio death row inmates, are plaintiffs in one such lawsuit, which was filed in 2003. This lawsuit is still pending in this Court, captioned In re Ohio Execution Protocol Litigation, Case No. 2:11-cv-1016 (formerly captioned Cooey v. Taft, Case No. 2:04 CV 1156), and hereinafter called the "Ohio Lethal Injection Litigation."

27.     At this point in Ohio and U.S. history, interest in the death penalty as an issue of public debate has never been greater. Speech against the death penalty, both by concerned citizens and by death row inmates including Plaintiffs, has been working to sway public opinion and heighten public interest. "[S]peech on 'matters of public concern'. . . is 'at the heart of the First Amendment's protection.'" Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) (citations omitted).

### B. There Have Been Numerous Botched Executions, Including Several In Ohio.

28.     One of the reasons for the increased prominence of the death penalty as an issue of public discussion and debate in recent years is the occurrence of so many botched executions by lethal injection.

29.     Ohio has been involved, either directly or indirectly, in at least **five** of the most seriously botched lethal injection executions or attempted executions in modern times, three of which occurred in **2014**. These include:

a.  **Joseph Clark**: Ohio executed Joseph Clark by lethal injection on May 2, 2006. At that time, a typical execution would take roughly a few minutes. Clark's execution took more than 90 minutes. After the execution had begun and the drugs were flowing, an IV in Clark's arm failed, and Clark said "your drugs aren't working." The curtain was closed and the execution team swarmed in to establish a new IV. It took them some 40 minutes, and 18-19 needles, before finally succeeding. Clark was heard moaning and in pain while the team worked on him. Clark experienced a lingering death. Only as a result of litigation was it eventually revealed that officials carrying out Clark's execution failed to properly give Clark the constitutionally required dose of anesthetic, meaning Clark almost certainly suffered a painful, unconstitutional death.

b.  **Romell Broom**: Ohio attempted to execute Broom by lethal injection on September 15, 2009. The execution team in Broom's case spent approximately two hours seeking to establish a working IV. As a result, Broom had some 18-19 painful puncture wounds, and many more painful attempts to stick his blood vessels within those 18-19 wounds, some of which spurted blood. Broom sobbed, was in pain, and was in distress throughout. The process was finally

9

stopped when Governor Strickland issued a so-called "reprieve," which ordered that Broom was to be executed again in one week. Broom was forced to sue, and he obtained a temporary injunction.  Whether Broom can lawfully be made to endure a second execution attempt is a matter that is still being litigated.

c. **Dennis McGuire**:  Ohio executed Dennis McGuire on January 16, 2014. The State chose to proceed with McGuire's execution using an experimental mixture of hydromorphone and midazolam. In a public hearing in the Ohio Lethal Injection Litigation that was conducted in the weeks before McGuire's execution, the State was warned by David Waisel, M.D., McGuire's medical expert, that hydromorphone and midazolam were not suitable for a human execution. The State nonetheless proceeded as planned, based upon the advice and/or recommendation of one of the State's hired medical experts for lethal injection matters. The identity of that expert hired by the State was always publicly known, but, under HB 663, the State's experts will now be kept secret and their identification information not allowed to be disclosed. McGuire's execution was a spectacle, just as McGuire's counsel and expert had warned.  It took McGuire some 26 minutes to die, and witnesses reported that he was struggling to breathe and gasping for air like a fish out of water during much of that time as he suffocated to death.

d. **Clayton Lockett**:  Clayton Lockett was executed by the State of Oklahoma on April 29, 2014.  Ohio was directly involved in the Lockett execution debacle because the "General Counsel in Ohio" provided advice to officials in Oklahoma, encouraging Oklahoma's use of midazolam as an execution drug and downplaying any concerns from Ohio's experience during the McGuire

execution. Warner v. Gross, Case No. 5:14-cv-665, Doc. No. 159, Plaintiffs' Proposed Findings of Fact and Conclusions of Law, at p. 8-9 of 83 (W.D. Okla. Dec. 12, 2014). Because of the incompetence of the execution team in Oklahoma, and their use of midazolam at Ohio's urging, Lockett's death was painful, lingering, undignified, and inhumane. See generally, id. at p. 10-44 of 83 (describing the horrific scene that unfolded during Lockett's execution); see also Cary Aspinwall & Ziva Branstetter, "Botched execution described as 'a bloody mess,' court filing shows," Tulsa World, December 14, 2014[3]; Katie Fretland, "Scene at botched Oklahoma execution of Clayton Lockett was 'a bloody mess,'" The Guardian, Dec. 13, 2014.[4]

e. **Joseph Wood**: Joseph Wood was executed by the State of Arizona by lethal injection on July 23, 2014. In public litigation in federal court in Arizona conducted in the weeks before Wood's execution, Arizona admitted that it would be using Ohio's protocol for hydromorphone and midazolam. Like McGuire, Wood's execution resulting in a lingering death. Wood took just shy of two hours to die by suffocation, and much of that time he was observed by witnesses to be gasping and gulping. Some reports indicate he gasped over 600 times during the execution.

30. The botched executions of Clark, McGuire, Lockett, and Wood, and the failed execution of Broom, received worldwide media attention.

---

[3]Available at http://m.tulsaworld.com/news/investigations/botched-execution-described-as-a-cluster-court-filing-shows/article_a4b70b76-84f7-5ebd-a5f3-044c205d474a.html?mode=jqm.

[4]Available at http://www.theguardian.com/world/2014/dec/13/botched-oklahoma-execution-clayton-lockett-bloody-mess.

31.     The actions, inactions, and failures of Defendants and others, including the Ohio execution team, DRC management, and the State's consultants, such as its medical expert, caused or contributed to the botched executions and thus this worldwide media attention.

32.     The media attention to these botched executions fueled the public debate and increased interest in the issue of the death penalty in general and in executions by lethal injection in particular.

> **C. Speech by Death Row Inmates Through Litigation Against Lethal Injection, Including the Ohio Lethal Injection Litigation, Has Drawn Additional Attention to the Death Penalty.**

33.     In addition to the botched executions, litigation against lethal injection by death row inmates across the country, including Plaintiffs and other Ohio death row inmates in the Ohio Lethal Injection Litigation, has increased the prominence of the death penalty as an issue of public debate.

34.     In addition to Ohio, a number of death-penalty states, including Arizona, Kentucky, Alabama, Florida, Louisiana, Oklahoma, and Missouri, among others, currently have pending lawsuits challenging lethal injection as practiced in those states (these lawsuits are hereinafter collectively called "Non-Ohio Lethal Injection Litigation").

35.     In Ohio, Phillips, Brinkley, Tibbetts, and Van Hook, among others, are plaintiffs in the Ohio Lethal Injection Litigation (previously identified *supra* at paragraph 26), which challenges, on constitutional and other grounds, the drugs, protocols, practices, and means by which executions by lethal injection are conducted in Ohio.

36.     For ease of reference throughout this Complaint, the Ohio Lethal Injection Litigation and the Non-Ohio Lethal Injection Litigation are hereinafter referred to collectively as "Lethal Injection Litigation."

37.     Death row inmates, including Phillips, Brinkley, Tibbetts, and Van Hook, who are plaintiffs in Lethal Injection Litigation, are by such litigation engaged in constitutionally protected speech because, among other reasons, such litigation is addressed to a subject matter of immense public concern, seeks to bring about change on such matter that extends beyond any one person and will have public ramifications, and is not primarily, if at all, seeking to further purely personalized grievances.

38.     Lethal Injection Litigation, including the Ohio Lethal Injection Litigation, has drawn additional attention to the death penalty and has been effective as a means of speech. It has shed light on the process of lethal injection, through discovery, public records requests, and evidentiary hearings. As a result, a serious debate has emerged in this state and country as to whether lethal injection is capable of being administered humanely, with substantial evidence being developed that it is not.

39.     Among many other things, for example, the Ohio Lethal Injection Litigation has focused public attention and debate on:

a.  The circumstances and causes of Ohio's many botched lethal injection executions and the extent to which they are due to incompetence and/or lack of training by the State actors who participate in such executions (including some Defendants) and/or by the failure and/or inability of such State actors to follow the Ohio written execution protocol;

b.  The unsuitability of midazolam and hydromorphone as lethal injection drugs, the risks such drugs present in causing an inhumane execution, the involvement of the State's medical expert in Ohio's adoption effective December 2009 of hydromorphone and midazolam as execution drugs, and the role those drugs played in the inhumane execution of Dennis McGuire;

13

c. The unsuitability for lethal injection purposes of compounded drugs, prepared by sources such as compounding pharmacies and pharmacists that are subject to much less regulation than manufacturers of FDA-approved pharmaceuticals, and the risks such compounded drugs present in causing an inhumane execution;

d. The federal and state laws that make it unlawful for compounding pharmacies and pharmacists to manufacture compounded drugs for use in lethal injection executions;

e. The federal and state laws that make it unlawful for the State to use execution drugs obtained from compounding pharmacies and pharmacists; and

f. The ethical and licensure issues arising from the participation in lethal injection executions of professionals involved in healing arts, such as doctors, nurses, pharmacists, EMTs, etc., whose professions have adopted ethical standards opposed to participation in executions and/or that are anathema to such participation, or of entities or persons who are licensed by agencies such as the federal Drug Enforcement Agency or Food and Drug Administration, or the Ohio State Board of Pharmacy who are potentially subject to enforcement actions and consequences for violating federal and state drug laws.

40. Such speech as practiced by Plaintiffs and others in Lethal Injection Litigation, which is at the core of what the First Amendment protects, could not have occurred or would not have been as effective, if death-penalty states like Ohio had been permitted to keep secret, and shield from public disclosure, all information about the identities of drugs, drug makers, and drug sources, and of professionals such as the State's medical expert, and others. The media would also not have been able to report as freely, if at all, on these important issues.

41.     Such speech has benefited Plaintiffs and other Ohio death row inmates.

**D. Speech By Citizens and Others Has Furthered the Debate and Fueled Discussion on Lethal Injection.**

42.     In addition to botched executions and Lethal Injection Litigation, speech by citizens and other people has drawn additional attention to the death penalty and has been effective at advancing the minority viewpoint.

43.     Prior to 2013, all of Ohio's execution drugs – including sodium thiopental, pentobarbital, hydromorphone, and midazolam – were manufactured by large, reputable, mainstream pharmaceutical companies like Lundbeck, Hospira, and Akorn, who are heavily regulated by the FDA, and are widely known and recognized around the world for the quality of their products.

44.     These companies are large conglomerates that do business in the United States and all over the world.

45.     And, it also used to be the case that Ohio obtained such "big-Pharma" drugs from or through reputable and nationally knows distributors, such as McKesson, a large, publicly traded corporation, or AmerisourceBergen, one of the largest global pharmaceutical sourcing and distribution services companies in the world.

46.     It was no secret that these manufacturers and distributors of pharmaceutical products were the suppliers of the execution drugs used in executions, including Ohio's executions. Ohio did not keep such information secret, nor could it have lawfully done so even if it had wanted.

47.     In recent years, speech in opposition to capital punishment and lethal injection has sought to educate and persuade participants in such executions to cease their participation. This speech has in part been directed toward persons and entities supplying U.S. death-penalty states, including Ohio, with the drugs and professional services essential for conducting executions by lethal injection.

48.     Such use of speech has been effective at achieving results desired by such speakers, including that pharmaceutical companies have decided not to permit their drug products to be used in executions. As a result, formerly common execution drugs are no longer available for use in executions.

49.     This directed use of speech has also helped persuade big-Pharma companies that it is in their interest for distribution agreements and other contracts, by which their drug products enter the stream of international commerce, to reflect their respective choices that such products not be used in executions.

50.     As a result, there are numerous examples in recent years of sophisticated commercial parties freely entering into contracts that reflect those parties' mutually expressed agreement that their curative drug products will not be used for the purpose of state-sanctioned executions by lethal injection. These matters have been widely covered in the global media and here in Ohio, and they are matters of great public interest and debate.

51.     Such speech, which is at the core of what the First Amendment protects, could not have occurred if death-penalty states like Ohio had been permitted to keep secret, and remove from public disclosure, information about the identity of those drug manufacturers and distributors who allowed their curative products to also be used in executions.

52.     Ohio has no history or tradition of restricting this type of speech. This includes speech generally against, or specifically directed towards, those persons and entities who have chosen, for their own personal, political, economic, or other reasons (and are paid for their participation), to supply drugs and other essential execution supplies, or to otherwise perform professional services for purposes of lethal injection executions.

53.     Such speech has benefited Plaintiffs and other Ohio death row inmates by increasing awareness of the inherent flaws with lethal injection and the death penalty in general.

16

54.     As a direct result of the effectiveness of such core First Amendment speech, U.S. death-penalty states, including Ohio, have been unable to obtain their preferred execution drugs, including pentobarbital and sodium thiopental, that are manufactured by reputable big-Pharma companies.

> **E. Information About the Administration of Lethal Injection Has Revealed the Process's Inherent Flaws as an Execution Method and Has Influenced Public Opinion Against It.**

55.     Another result of the informed debate that has been taking place in this country about the death penalty is the exposure of inherent flaws with lethal injection as a method of execution. The information necessary to refute the misconception that lethal injection provides an "enviable" "quiet death" has come from various traditionally open sources and proceedings including litigation/evidentiary hearings, discovery, public records requests, media reports, and investigations, among other sources.

56.     One inherent flaw of lethal injection that has been exposed is its paradoxical reliance on substances designed and personnel trained to save lives, put instead to the purpose of ending lives. This flaw is not capable of correction, and, as such, lethal injection has accurately been described as an "enterprise doomed to fail":

> Subverting medicines meant to heal the human body to the opposite purpose was an enterprise doomed to failure. . . . Using drugs meant for individuals with medical needs to carry out executions is a misguided effort to mask the brutality of executions by making them look serene and peaceful—like something any one of us might experience in our final moments. See Callins v. Collins, 510 U.S. 1141, 1143 (1994) (Scalia, J., concurring in denial of certiorari) ("How enviable a quiet death by lethal injection . . . ."). But executions are, in fact, nothing like that. They are brutal, savage events, and nothing the state tries to do can mask that reality. Nor should it. If we as a society want to carry out executions, we should be willing to face the fact that the state is committing a horrendous brutality on our behalf.

<u>Wood v. Ryan</u>, 759 F.3d 1076, 1102 (9th Cir. 2014) (Kozinski, C.J., dissenting from the denial of rehearing en banc). Additional information about the details of executions conducted by lethal injection will likely confirm, and thereby strengthen, this viewpoint.

57.     Public debate generally on the appropriateness of the death penalty as a punishment has become a topic of increasing interest.  <u>See, e.g.</u>, Hamilton Nolan, "The Death Penalty Is Slowly Dying" (discussing the 2014 Death Penalty Information Center annual report, and generating over 201 written comments as of December 18, 2014).[5]

58.     This interest has been motivated in recent years in part by the awareness of wrongful convictions, particularly in capital cases. <u>See</u> "The Innocent and the Death Penalty," Innocence Project information page re: DNA death row exonerations (last accessed 12/18/14[6]; <u>see also</u> Pete Yost, "Study: 1 in 25 death cases likely innocent," Associated Press (Apr. 28, 2014) ("About one in 25 people imprisoned under a death sentence is likely innocent, according to a new statistical study appearing in the Proceedings of the National Academy of Sciences.").[7]

59.     A half-dozen states have abolished capital punishment over the last seven years and others have imposed moratoriums or have explored legislation to repeal it. <u>See</u> Peter Baker, "Obama Orders Policy Review on Executions," NEW YORK TIMES (May 2, 2014).[8]

---

[5]Available at http://gawker.com/the-death-penalty-is-slowly-dying-1672738213.

[6]Available at http://www.innocenceproject.org/Content/ The_Innocent_and_the_Death_ Penalty.php.

[7]Available at http://bigstory.ap.org/article/study-1-25-death-cases-likely-innocent.

[8]Available at http://www.nytimes.com/2014/05/03/us/flawed-oklahoma-execution-deeply-troubling-obama-says.html?_r=0.

60.     New Hampshire's legislative repeal of the death penalty failed in April 2014 by a single vote. <u>See</u> Katherine Q. Seelye, "Measure to Repeal Death Penalty Fails by a Single Vote in New Hampshire Senate," NEW YORK TIMES (Apr. 17, 2014).[9]

61.     A legislative repeal of Delaware's death penalty passed the state Senate in March 2013 after significant debate. <u>See</u> "Delaware Senate approves repeal of death penalty," Politico (Mar. 26, 2013).[10]

62.     In November 2012, California came close to abolishing the death penalty when a repeal proposition narrowly lost 53% to 47%. <u>See</u> Mary Slosson, "California Voters Reject Measure to End Death Penalty," Chicago Tribune (Nov. 7, 2012).[11]

63.     Pope Francis has also recently called for abolishing the death penalty. Francis X. Rocca, "Pope Francis calls for abolishing the death penalty and life imprisonment," Catholic News Service (Oct. 23, 2014).[12]

---

[9]Available at http://www.nytimes.com/2014/04/18/us/in-new-hampshire-measure-to-repeal-death-penalty-fails-by-a-single-vote.html.

[10] Available at http://www.politico.com/story/2013/03/death-penalty-repeal-delaware-89363.html.

[11]Available at http://articles.chicagotribune.com/2012-11-07/news/sns-rt-us-usa-campaign-deathpenaltybre8a62b3-20121107_1_death-penalty-california-executions-repeal-measure.

[12] Available at http://www.catholicnews.com/data/stories/cns/1404377.htm.

64.     The number of executions per year has fallen by more than half since its modern peak in 2000.  Death Penalty Information Center, The Death Penalty In 2014: Year End Report.[13]



65.     The number of death sentences handed down in 2014 is the lowest number in the forty years of the modern death penalty.  Id.

66.     Although their position is gaining traction as a result of these and other developments, those in the U.S. opposed to capital punishment remain in the minority. See, e.g., Gallup Poll conducted Oct. 12-15, 2014 (33% of persons polled "not in favor" of the death penalty for a person convicted of murder).[14]

67.     Rather than permit public debate to continue its progression in the current direction, which is the direction contrary to their preferred course, Ohio and certain other death penalty states

_____

[13]Available at http://deathpenaltyinfo.org/documents/2014YrEnd.pdf.

[14]Available at http://www.gallup.com/poll/1606/death-penalty.aspx.

20

have chosen to cut-off information driving this progression, thereby unilaterally arresting the advancement of the minority position that has gained traction. They have done so by restricting previously available information that was relied upon by those in the minority to express their unpopular viewpoint against capital punishment by lethal injection.

68.     These states do not like the fact that opposition to the death penalty has made it more difficult to carry out a function they deem necessary. But citizens acting in a lawful manner to influence public policy in a way which comports with their beliefs is the very essence of democracy. The government has no power to silence its citizens because it does not like the result of that speech.

### F. Other States Have Responded to the Use of Speech About Lethal Injection With Legislation That Suppresses It.

69.     Instead of seeking to refute speech concerning lethal injection with counter-speech, other states, such as Arizona, Georgia, Missouri, Oklahoma, and South Dakota, have in recent years chosen to respond to such speech with legislation whose purpose and effect is to suppress the speech, thereby arresting the debate.

70.     These laws suppress speech by, among other things, making confidential, secret, and no longer subject to public disclosure the identities of those persons and entities who provide drugs and other professional services for use in lethal injection executions.

71.     Upon information and belief, such legislation was secured, in part, based upon claims that participants (broadly defined to include drug sources and manufacturers) in lethal injection executions would, absent the protections provided by the statute, be subjected to "physical harm" and "harassment" by virtue of their participation.

72.     These claims of "physical harm" and "harassment" are not credible. For example, an independent investigation by the Associated Press, reported on in April 2014, determined that, in all states reported, there was "scant" evidence of threats to execution drug makers. Indeed, there

was no "physical harm" reported to anyone, and "harassment" was found to include such things as: (a) inquiries from the press; (b) "hate" mail and messages; (c) being subjected to court process in prisoner litigation; and (d) being subjected to peaceful protests. See Associated Press, "Evidence of Threats Cited by Texas for Keeping Supplier of Execution Drugs a Secret is Scant" (April 4, 2014).[15]

73.     It does not constitute "physical harm" and "harassment" for persons and entities who have volunteered – for their own personal, political, economic, or other reasons (and are compensated for their participation and not compelled to participate) – to supply drugs and other essential execution supplies, or to otherwise perform professional services for purposes of lethal injection executions, to be exposed to the speech of other citizens who oppose such participation or would like it to cease. The First Amendment protects speech directed at soldiers involved in unpopular wars and at abortion providers; by logical extension it also protects speech directed at the recipients the State seeks to shield here, for example, pharmacists who choose to make compounded execution drugs, or companies that would provide the raw materials for those drugs or even the manufactured drugs themselves. Indeed, even speech intended to effect a coercive impact on the recipient is protected by the First Amendment. See, e.g., Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971) ("The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others.

---

[15]Available at http://www.foxnews.com/us/2014/04/03/evidence-threats-cited-by-texas-for-keeping-supplier-execution-drugs-secret-is/.

But so long as the means are peaceful, the communication need not meet standards of acceptability.").

74.    It also does not constitute "physical harm" and "harassment" for voluntary participants in lethal injection executions to be exposed to legal claims or reporting to the relevant enforcement authorities that their participation and their actions may violate state and/or federal laws.

75.    Just because a particular activity is controversial and more likely to result in speech than a mundane activity does not give the government the power to create special privileges restricting speech rights to entice those actors to serve the government's desired interest.  Indeed, speech on public issues that people may find offensive or may make them uncomfortable is vigorously protected by the First Amendment precisely because it most needs protection. See, e.g., Terminiello v. Chicago, 337 U.S. 1, 4 (1949) (noting that speech "best serve[s] its high purpose when it induces a condition of unrest . . . and stirs people to anger"); McCutcheon v. FEC, 134 S. Ct. 1434, 1441 (2014); Organization for a Better Austin v. Keefe, 402 U.S. at 419.

76.    The exposure of execution participants, including execution drug sources or providers, to such speech does not constitute "physical harm" and "harassment" simply because the State does not like the viewpoint of the speakers and/or does not want the speech to succeed or because the recipients of the speech do not want to be bothered by having to listen to it or be exposed to it.

77.    Sufficient protections exist, including criminal laws, and are already in place to protect against speech that constitutes and/or threatens actual "physical harm" and "harassment." The solution is not to suppress speech. See, e.g., Snyder v. Phelps, 131 S. Ct. 1207 (2011) (First Amendment even protects picketing near a soldier's funeral service).

### G.  Ohio's Legislative Response to the Speech is HB 663.

78.     On December 19, 2014, Gov. Kasich signed HB 663. (A copy of the enacted law is attached as Exhibit 1.) The law is Ohio's legislative response to the speech of death-penalty opponents and of inmates like Plaintiffs. HB 663 was passed at least in part on reliance on the reports of "physical harm" and "harassment" in other states as a reason necessitating the legislation, and has the purpose and effect of arresting debate on lethal injection.  Its chilling effect is immediate.

79.     HB 663 has four principal features that are relevant to this constitutional challenge: (**1**) compelled secrecy; (**2**) disciplinary and licensure immunity for licensed professionals involved in lethal injection; (**3**) sealing of court records and a system of "private hearings"; and (**4**) civil sanctions for disclosure of information covered by the statute. These four provisions are collectively referred to herein as "the Challenged Provisions of HB 663." Each provision is addressed in turn below.

80.     **COMPELLED SECRECY**: HB 663 conceals from the public as "confidential, privileged, and not subject to disclosure" the identities of all persons and entities who provide drugs or other products and services for use in an execution by lethal injection. This provision applies whether the identity is that of a big-Pharma company or a solitary compounder, or anything in between, and to all other persons or entities providing any professional or other services or assistance in Ohio's lethal injection executions with the sole exceptions of the Director of DRC and the Warden of SOCF.

81.     The compelled secrecy is enforced both by exempting any such information from disclosure under Ohio's public records statute, Ohio Rev. Code § 149.43, and also by an entirely new statutory section (Ohio Rev. Code § 2949.221) declaring the information to be "confidential," "privileged," and "not subject to disclosure."

24

82.     In relevant part, the statute provides:

(B) If, at any time prior to the day that is twenty-four months after the effective date of this section, a person manufactures, compounds, imports, transports, distributes, supplies, prescribes, prepares, administers, uses, or tests any of the compounding equipment or components, the active pharmaceutical ingredients, the drugs or combination of drugs, the medical supplies, or the medical equipment used in the application of a lethal injection of a drug or combination of drugs in the administration of a death sentence by lethal injection as provided for in division (A) of section 2949.22 of the Revised Code, notwithstanding any provision of law to the contrary, all of the following apply regarding any information or record in the possession of any public office that identifies or reasonably leads to the identification of the person and the person's participation in any activity described in this division:

(1) The information or record shall be classified as confidential, is privileged under law, and is not subject to disclosure by any person, state agency, governmental entity, board, or commission or any political subdivision as a public record under section 149.43 of the Revised Code or otherwise.

(2) The information or record shall not be subject to disclosure by or during any judicial proceeding, inquiry, or process, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.

(3) The information or record shall not be subject to discovery, subpoena, or any other means of legal compulsion for disclosure to any person or entity, except as described in division (B)(4) of this section or in section 2949.222 of the Revised Code.
 . . . .

(C)(1) If, at any time prior to the day that is twenty-four months after the effective date of this section, an employee or former employee of the department of rehabilitation and correction or any other individual selected or designated by the director of the department participates or participated in the administration of a sentence of death by lethal injection, as provided for in division (A) of section 2949.22 of the Revised Code, subject to division (C)(2) of this section and notwithstanding any other provision of law to the contrary, the protections and limitations specified in divisions (B)(1), (2), and (3) of this section shall apply regarding any information or record in the possession of any public office that identifies or reasonably leads to the identification of the employee, former employee, or other individual and the employee's, former

25

employee's, or individual's participation in the administration of the sentence of death by lethal injection described in this division.

(2) Division (C)(1) of this section does not apply with respect to information or a record that identifies or reasonably leads to the identification of the director of rehabilitation and correction or the warden of the state correctional institution in which the administration of the sentence of death takes place.

Ohio Rev. Code § 2949.221(B), (C).

83.     HB 663 further provides that the protections and limitations of the statute that compel the secrecy and prohibit the disclosure of identifying information are "rights" that are conferred upon the intended beneficiaries of these secrecy and non-disclosure provisions. But individuals are automatically forced into these "rights," without any opt-out provision available to individuals or any need to take any action whatsoever. Persons that are not individuals, such as corporations, partnerships, and other artificial entities, are permitted to choose whether to invoke the secrecy "rights," and if they do, they must submit a pro forma written application requesting these "rights." The Director of DRC is required to approve the application once submitted, and upon such approval the entity is entitled to the statutory protections for 20 years from the time the entity ceases the activity qualifying it for such rights. Ohio Rev. Code § 2949.221(D).

84.     Plaintiffs believe, and therefore allege, that all non-individuals entitled to the protection of HB 663 will seek and easily obtain such protection as a matter of course.

85.     **DISCIPLINARY AND LICENSURE IMMUNITY**: HB 663 prohibits the licensing authorities of any licensed profession (such as medicine, pharmacy, nursing, law, etc.) from imposing any discipline and/or any licensing sanction upon any doctor, pharmacist, nurse, lawyer, or other professional licensed by any such authority, or on a similarly licensed corporate entity, as a result of such person's or such entity's participation in, consultation for, or providing any services concerning executions by lethal injection. HB 663 also purports to preclude federal or state agencies such as the DEA, FDA, Ohio State Board of Pharmacy, or any other similar

26

agency or authority that would issue a license under applicable drug-control laws, from even knowing the identity of persons or entities that will be violating myriad federal and state drug laws in the course of taking actions related to executions and/or execution drugs. Similarly, HB 663 purports to preclude those agencies or authorities, federal and/or state, from taking any enforcement actions against those who violate the various drug control laws in the context of an execution.

86.    It purports to do all of this by the following language:

> (E) If a person or entity that, at any time prior to the day that is twenty-four months after the effective date of this section, participates in, consults regarding, performs any function with respect to, including any activity described in division (B) of this section, or provides any expert opinion testimony regarding an execution by lethal injection conducted in accordance with division (A) of section 2949.22 of the Revised Code is licensed by a licensing authority, notwithstanding any provision of law to the contrary, the licensing authority shall not do any of the following as a result of that participation, consultation, performance, activity, or testimony by the person or entity:
>
> (1) Challenge, reprimand, suspend, or revoke the person's or entity's license;
>
> (2) Take any disciplinary action against the person or entity or the person's or entity's licensure.

Ohio Rev. Code § 2949.221(E).

87.    **SEALING OF COURT RECORDS AND A SYSTEM OF "PRIVATE HEARINGS":** HB 663 also imposes requirements on courts to ensure that information subject to the compelled secrecy and related provisions of the law do not become part of the public record and are not publicly filed in any court.

88.    It does this in the following language:

> (A) As used in this section, "seal a record" means to remove a record from the main file of similar records and to secure it in a separate file that contains only sealed records accessible only to the court.

27

> (B) The court promptly shall order the immediate sealing of records containing information described in division (B) or (C) of section 2949.221 of the Revised Code and the person's participation in any activity described in the particular division, whenever the records come into the court's possession.

Ohio Rev. Code § 2949.222(A), (B).

89. The law also includes a procedure for disclosure of records that are subpoenaed or requested by a court order. The statute requires that the director of DRC "shall provide" such records, although it does not specify to whom they are to be provided. If the statute is construed to require the director of DRC to produce the subpoenaed records to the litigant issuing the subpoena, the records are still nevertheless subject to the "sealing" and non-disclosure and civil sanction provisions of the statute. If the statute is construed to require the director of DRC to produce the subpoenaed records to the court rather than the litigant issuing the subpoena, there are additional restrictions that apply before a litigant may obtain the records, all of which operate as a prior restraint. In that situation, the statute requires the court to determine if the record is "necessary for just adjudication." If the court so concludes, then the court must order the DRC director to appear at a "private hearing." And, even if a record is determined by the court to be "necessary for just adjudication," the record will nevertheless be precluded from disclosure by the court unless the court finds, based on "clear and convincing" evidence "presented" in the "private hearing," that the person identified in the record has acted unlawfully—which may or may not be an independent issue from the record's relevance to a "just adjudication." The statute does these things in the following language:

> (C) If a record containing information described in division (B) or (C) of section 2949.221 of the Revised Code and the person's participation in any activity described in the particular division, is subpoenaed or requested by a court order, the director of rehabilitation and correction shall provide the record. If the court determines that the record is necessary for just adjudication, the court shall order the director to appear at a private hearing with a copy of the record and any other relevant evidence. The information

is not otherwise subject to disclosure unless the court, through clear and convincing evidence presented in the private hearing, finds that the person whose identity is protected appears to have acted unlawfully with respect to the person's involvement in the administration of a lethal injection as contemplated by the first paragraph of division (B) and by division (C)(1) of section 2949.221 of the Revised Code.

90. **CIVIL SANCTIONS FOR DISCLOSURE**: Not only does HB 663 make the identification information secret and prohibit its disclosure and public filing, but it also subjects any person who improperly discloses the information to a civil cause of action in which punitive damages and attorney fees can be awarded.

91. It does this in the following language:

(F) A person may not, without the approval of the director of rehabilitation and correction, knowingly disclose the identity and participation in an activity described in the particular division of any person to whom division (B) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division or of an employee, former employee, or other individual to whom division (C)(1) of this section applies and that is made confidential, privileged, and not subject to disclosure under that division. Any person, employee, former employee, or individual whose identity and participation in a specified activity is disclosed in violation of this division has a civil cause of action against any person who discloses the identity and participation in the activity in violation of this division. In a civil action brought under this division, the plaintiff is entitled to recover from the defendant actual damages, punitive or exemplary damages upon a showing of a willful violation of this division, and reasonable attorney's fees and court costs.

Ohio Rev. Code § 2949.221(F).

92. This provision operates as a prior restraint, as it would prevent any individual from speaking out to reveal unlawful activity, or even activity that the speaker believes to be immoral, objectionable, or otherwise worthy of public discussion.

### H. The Primary Purpose of HB 663, and Its Intended and Actual Effect, is to Silence the Speech of Those Who Hold a Viewpoint Contrary to That Which the State Holds.

93.     The primary purpose of HB 663, and its intended and actual effect, is to burden, silence, and suppress the speech of citizens and others whose viewpoint on the death penalty the State does not share, to significantly diminish successes gained through the use of such speech and inmate advocacy, and to enforce secrecy with harsh punitive sanctions so that such speech and advocacy cannot again be successful. Every objective indication shows that the provision's primary purpose is to restrict speech that opposes lethal injection. See, e.g., McCullen v. Coakley, 134 S. Ct. 2518, 2544 (2014) (Scalia, J., concurring).

94.     The legislature's improper purpose is evidenced in at least two ways: **(1)** the written "findings" that were removed from the text of the bill immediately before it was approved by the Senate committee for its final vote but which were part of the bill when it was passed by the Ohio House on November 20, 2014; and **(2)** public statements made in support of HB 663 by numerous individual legislators and by other elected officials who were principal and visible supporters of the bill.

95.     The written "findings," even though not part of the final bill that was passed into law, are part of the law's legislative history and thus comprise direct evidence of the legislature's improper purpose. The "findings" constitute factually devoid pretexts for targeting the undesired viewpoint or are expressed declarations for doing so, or both. See HB 663 as passed by the House on Nov. 20, 2014 (cited as "House Version, §__") (attached as Exhibit 2). These include:

96.     **The "finding" that the anonymity and confidentiality decreed by the statute are necessary in order to protect persons who assist in executions from "harassment and potential physical harm."** House Version, § 2949.221(B)(1).

a.   This "finding" is not supported by the facts (see paragraphs 69-77, *supra*).

b. It is refuted by the history of some 53 executions in Ohio, from 1999 to January 2014, during which there was never any "secrecy" statute like HB 663 in place, and, still, there was no evidence of any such "harassment" or "physical harm" to anyone.

c. Requiring execution team members to participate in depositions and provide discovery about their roles in and knowledge about botched executions and/or violations of the execution protocol is not "harassment."

d. Requiring physicians and other professionals who consulted with the State on execution drugs and their potential suitability for human executions to participate in depositions and provide discovery about their roles in and knowledge about botched executions and/or violations of the execution protocol is not "harassment."

97. **The "finding" that, without the "protections of confidentiality and anonymity, [DRC] cannot obtain the necessary assistance of persons in carrying out a court-ordered sentence of death by lethal injection or the drugs needed to administer such a sentence."** House Version, § 2949.221(B)(3).

a. This "finding" is not supported by the facts.

b. It too is refuted by the history of some 53 executions in Ohio, from 1999 to January 2014, during which there was never any "secrecy" statute like HB 663 in place, and, still, there was no evidence of any problems recruiting persons to assist DRC in carrying out any of these death sentences or, with the limited exception of only very recently, to supply DRC with the execution drugs.

c. There have been dozens of persons who have voluntarily participated and assisted in Ohio lethal injection executions from 1999 to 2014, despite no

"secrecy" statute like HB 663, including professionals with licensure considerations such as doctors, pharmacists, EMTs, and nurses.

d. Obtaining the drugs was never a problem despite the absence of a secrecy statute like HB 663.

e. Nor has it ever been a problem that, prior to HB 663, public disclosure was always freely permitted as to the identities and other relevant information concerning the following direct and indirect participants in Ohio's lethal injection executions: **(i)** medical and other experts and consultants retained by the State; **(ii)** drug suppliers and pharmacists used by the State as the source of the execution drugs; **(iii)** doctors, nurses, and mental health professionals conducting the required checks and assessments on an inmate in the minutes and hours leading up to an execution; **(iv)** doctors and nurses directly participating in executions (including, for example, the doctor who participated in Broom's attempted execution); **(v)** doctors assessing the inmate's status during an execution and pronouncing death; **(vi)** pharmacists, lawyers, and other professionals involved in providing the required periodic trainings and rehearsals for the execution team members; and **(vii)** many other direct participants in executions including DRC upper management personnel at levels below the director, DRC lawyers (e.g., during Broom's attempted execution), DRC's spokespersons and press officers, and the DRC employee creating the contemporaneous execution timeline for an execution.

f. And, to the extent speech and inmate advocacy opposed to capital punishment have only recently made it more difficult for DRC to obtain drugs, the solution is not for the State to suppress the speech and hide the identities of those citizens

most essential for hearing the anti-death-penalty viewpoint of their fellow citizens. Instead, the State and those sharing its viewpoint should engage in their own counter-speech to seek to persuade drug makers and others to participate. Alternatively, the State should find another method of execution where essential participants are unwilling to be persuaded by the speech of people whose viewpoint is opposed to capital punishment.

98.     **The "finding" that persons and businesses who provide assistance in the lethal injection process in "other states that carry out death sentences by lethal injection" have "been subjected to actual threats of physical harm and to harassment, and . . . have been subjected to risks to personal safety."** House Version, § 2949.221(B)(2).

a. This "finding" is not supported by the facts and, even if true (which it is not, see *supra* at pars. 69-77), it does not reflect Ohio's experience.

b. Moreover, it is believed that most if not all of such alleged instances in "other states" are purely anecdotal, have been greatly exaggerated, and/or are comprised primarily if not entirely of complaints by persons who have chosen to participate in executions but who do not want to have to listen to the speech of those opposed to their participation.

c. Although some pharmacists making drugs for use in executions, for example, may not want to listen to the speech of people opposed to the death penalty, there are protective measures, including criminal laws, already in place which protect against intimidation and abuse, and these measures are sufficient in this context just as they are in similarly controversial activities (abortion providers, weapon manufacturers, etc.). These measures include laws against intimidation, trespassing, and vandalism to protect those who participate in activities that

33

some people find morally objectionable. There is no evidence that the public pressure faced by execution drug makers, for example, is any greater than that faced by weapons manufacturers or abortion providers.

99.    **The "finding" that HB 663, including its secrecy provisions, are "designed to prevent and preclude foreign and domestic corporations, partnerships, companies, or persons from obstructing justice by interfering with the lawful enforcement of state court judgments, which enforcement is a fundamental task of any sovereignty," and where the alleged "obstruction" is identified by the legislature as "entering into contracts designed to prevent [DRC] from obtaining [execution drugs].**" House Version, § 2949.221(B)(4).

    a.   This "finding" vividly reveals the legislature's improper purpose of silencing speech that favors the viewpoint with which it disagrees.

    b.   The bill as introduced and passed by the House, included the chilling conclusion that those opposed to capital punishment by lethal injection, who have chosen to reflect that opposition and belief in contracts freely negotiated, are engaged in criminal behavior, i.e., "obstruct[ion] of justice." None of the disfavored speech constitutes obstruction of justice, nor any other crime. To the best of Plaintiffs' knowledge, no one has ever been prosecuted for such a crime in this context, nor could anyone be prosecuted for such lawful activity.

    c.   Such a chilling conclusion has instead been made not because it is accurate, but with the intention to scare and intimidate, in order to effectively silence, people engaged in or planning to engage in speech against capital punishment by lethal injection, a viewpoint the State opposes and does not want to be effectively heard.

34

    d.   The chilling conclusion that certain speech constitutes obstruction of justice is also intended to suppress speech by drug suppliers and distributors, including compounding pharmacies and pharmacists, who might now or in the future contemplate entering into such a contract.

    e.   The chilling conclusion is also intended to suppress speech by those third parties opposed to the death penalty by lethal injection who might now be engaged in, or may be contemplating engaging in, speech seeking to persuade drug makers, compounders, pharmacists, doctors, nurses, EMTs, and other persons now involved or considering becoming involved in lethal injection executions that their participation should be withheld on compelling grounds of morality, humanity, religion, and/or professional standards and/or ethics.

100.   These "findings" of criminal behavior are akin to an allegation that U.S. college students of the mid-1960's who protested against Dow Chemical and other companies that made the napalm used against civilians during the Vietnam War were, by virtue of their speech, engaged in "treason" because their speech, too, concerned one of a sovereign's "fundamental tasks" (there, waging war). It is unthinkable that Congress could have lawfully responded to such speech, at the core of the First Amendment and honored today by history (because Dow and other manufacturers eventually succumbed to the public pressure and ceased making napalm), by enacting legislation that suppressed such speech, labeled the students criminals, and permitted the government to keep secret the identifying information about napalm makers in order to shield them from speech the government did not want effectively heard.

101.   The legislature's improper purpose with HB 663 is also evidenced by public statements made in support of HB 663 by numerous individual legislators and by other elected officials who were principal and visible supporters of the bill. These include, but are not limited

to, statements that the bill is necessary in order to protect drug makers and others from protests and picketing. Sen. John Eklund, for example, said that the pharmacies "have become subjected to not just criticism but downright attack, boycotts and picketing at their homes. Consequently many of these pharmacies have become unwilling … to subject themselves to that aggravation." J. Siegel and R. Ludlow, "Senate Approves Execution-Secrecy Bill," Columbus Dispatch (Dec. 12, 2014).[16] See also Alan Johnson, "Execution drug secrecy bill has unintended consequences, opponents testify," Columbus Dispatch (Dec. 5, 2014)[17]; Mark Kovac, "Ohio Senate Approves Measure to Shield Names of Lethal Injection Drug Suppliers," Cuyahoga Falls News Press (Dec. 12, 2014).[18]

102.    Representative James Buchy, a co-sponsor of HB 663, said that compounding pharmacies are reluctant to make the execution drugs unless they can remain anonymous, "for fear of public reprisal." Jeremy Pelzer, "Death-penalty bill approved by Ohio House," Northeast Ohio Media Group (Nov. 20, 2014).[19] Representative Buchy also said that HB 663 would protect compounding pharmacies from lawsuits. Jeremy Pelzer, "Death-penalty reform bill would protect execution drug makers, physicians who testify," Northeast Ohio Media Group (Nov. 10, 2014).[20]

---

[16]Available at http://www.dispatch.com/content/stories/local/2014/12/11/execution_secrecy_bill.html.

[17]Available at http://www.dispatch.com/content/stories/local /2014/12/04/death-penalty-hearing.html.

[18]Available at http://www.fallsnewspress.com/latest%20headlines/2014/12/12/ohio-senate-approves-measure-to-shield-names-of-lethal-injection-drug-suppliers.

[19]Available at http://www.cleveland.com/open/index.ssf/2014/11/death-penalty_bill_approved_by_ohio_house.html.

[20]Available at http://www.cleveland.com/open/index.ssf/2014/11/death-penalty_reform_bill_woul.html.

103.    Notably, Sen. Eklund offered no evidentiary support for his allegations of "downright attack[s]" on pharmacies, and none of the other supporters and advocates in favor of the legislation cited any actual evidence of genuine threats or "attacks" on pharmacies.

104.    Moreover, any attempt to justify HB 663's restrictions based upon purported concerns about "boycotts and picketing" or "lawsuits" is abhorrent to the First Amendment. The First Amendment "vigorously protects" the right to protest and picket on matters of public concern. This right is protected even when the act includes "flag burning, funeral protests, and Nazi parades," which might be viewed by some as a "spectacle" or cause "profound offense." McCutcheon v. FEC, 134 S. Ct. 1434, 1441 (2014). See also Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971) ("No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court.").

105.    Not only does HB 663 thus have the purpose to silence and suppress the speech of citizens whose opinions on the death penalty the majority does not share, including inmates like Plaintiffs as expressed in the Ohio Lethal Injection Litigation, but it will have the effect of chilling and unduly burdening such speech, both in general and as compared to speech in favor of capital punishment and lethal injection.

106.    Some of the ways in which HB 663 will burden speech of people opposed to capital punishment by lethal injection are identified above in paragraphs 96-99. The statute will burden such speech in other ways too.  These include, but are not limited to:

   a.   As with the speakers opposed to another constitutionally-approved public policy, abortion, those opposed to capital punishment must seek to convince their fellow citizens of the moral imperative of their cause. And, as with abortion, the speech is nowhere more important than when directed at those

37

citizens who have chosen to personally engage in the challenged activity, here, the drug makers, compounders, pharmacists, doctors, nurses, EMTs, and other such persons and entities. Unless the identities of such persons and entities are known, it is impossible for speakers to direct their message to such persons and entities. Moreover, they will be unable to do so at the time and place where the act is about to occur, when the speech is most important. Speech makes a difference when acts of lasting significance and profound moral consequence are being contemplated. See Hill v. Colorado, 530 U.S. at 788 (Kennedy, J., dissenting). HB 663 makes impossible such speech by hiding the identities of those for whom the speech is most directly intended by speakers opposed to capital punishment.

b. Speech directed at the state licensing authorities and other professional organizations of the professionals who participate in or lend assistance to the State in conducting executions by lethal injection (doctors, nurses, pharmacists, EMTs, etc.) is an effective method of achieving the lawful goals of those opposed to capital punishment. Such speech has been effective at least in part in causing some professionals, initially willing to participate in or lend assistance to the State in lethal injection executions, to change their minds and cease providing such services. One such example is Ohio's long-time medical expert for lethal injection matters. By making the identities of some or all such professionals confidential, and also barring licensing boards from disciplining such professionals for their participation in lethal injection, HB 663 here too has retaliated against speech, has burdened speech that favors the viewpoint

with which it disagrees, and has disabled one side of the debate from directing its message to an important audience for that side's viewpoint.

c.  Speech directed to regulatory authorities such as the DEA, the FDA, the OSBP, or other federal or state agencies or authorities, based on allegations of unlawful actions taken by those protected by HB 663's secrecy provisions is likewise significant speech in support of the notion that the rule of law must be followed, even when—especially when—carrying out the most significant state action against an individual. Preventing speech that would identify illegal actions, and preventing a licensing authority such as the DEA or FDA or OSBP from taking enforcement action, limits the ability of those opposed to the death penalty from ensuring that the State is not breaking the law with impunity.

d.  Not only does HB 663 hide the identities of some of the most important audiences for the message of those citizens opposed to capital punishment, but it also subjects persons who disclose such identities to potentially ruinous civil causes of action, including punitive damages and attorney fees. For example, those wishing to hold a peaceful protest or silently picket on public property near a compounding pharmacy would not be able to assemble there because simply sharing the address of the place they wish to gather will subject them to fines and penalties under the statute. Or those wishing to inform federal or state enforcement agencies or authorities about violations of federal or state law in the course of carrying out an execution would be prevented from reporting such violations, because simply identifying the actor whose actions violate the law will bring significant fines and penalties under HB 663. Given that people opposed to capital punishment are much more likely to seek the disclosure of

39

such identities, and that those in favor of capital punishment would rarely if ever need or want to do so (especially when doing so is believed by them to impair the effectiveness of a policy they favor and seek to promote), HB 663 here too directly burdens the speech of those opposed to capital punishment by lethal injection. In these ways HB 663 reflects aversion to what disfavored speakers have to say, and disables the disfavored speakers from reaching an important target audience.

e. The prohibition on speech effected by HB 663 is largely, if not entirely, one-sided, blunting the viewpoint only of the opponents of capital punishment, but not its proponents. The persons involved in carrying out lethal injection executions (drug makers, compounders, pharmacists, doctors, nurses, EMTs, etc.) are, by the secrecy imposed under the statute, shielded from the perceived unwanted message of capital punishment's opponents and, instead, are assured of virtually always hearing what death-penalty advocates want them to hear, from state officials who know their identities and from like-minded family and friends to whom participants voluntarily disclose their roles in executions (thereby violating HB 663 in the process). Such persons can be expected to reliably and frequently tell the execution participants that they are doing the right thing, that their services are valuable and appreciated, that they are helping to deliver justice to the victims and their loved ones, that the condemned prisoner deserves to die, that their services promote the canons of their professions rather than betray those canons, etc. Ohio seeks to shield these individuals from hearing speech it deems undesirable because that speech is against the State's favored viewpoint.

f. "Experts" and "consultants" hired by the State on lethal injection matters are permitted to remain anonymous and their identifying information prohibited from disclosure. "Experts" and "consultants" hired by inmates like Plaintiffs, on the other hand, receive no such protections. Their identification remains a matter of public record, and they are thus subjected to speech by those who favor lethal injection and would seek to persuade them to change their views on this controversial issue and/or, regardless of their views, to not assist inmates.

g. It sometimes happens that persons who have participated in lethal injection executions will, upon ceasing their participation for whatever reason, come to believe from the perspective of their first-hand experience in the process that the death penalty is flawed and should no longer be used. For example, at least two former recent directors of DRC have experienced such a conversion, and so has a recent former Ohio Attorney General. But individuals are forced into perpetual silence and anonymity, even while corporate entities may opt in or out of the Challenged Provisions of HB 663 for a period of 20 years. By making the identification information of execution participants confidential and not subject to disclosure, the statute intentionally chills the speech of those participants or former participants in Ohio lethal injection executions who experience such a conversion, with the effect being that such persons who would otherwise be willing to speak publicly about their experiences will not be willing to do so, especially in light of the severe financial penalties the new law contains. This intentionally chilling effect applies to former Wardens of SOCF and Directors of DRC, even though their identification information is not itself made secret, because any such speech by these persons is still

41

constrained by the requirement that the speech must not identify or "reasonably lead to the identification" of any protected person. But the intentionally chilling effect applies to an even greater extent to the lower level employees and former employees of DRC, and to other less politically-astute and/or less-powerful participants. This is because such persons will be less likely to risk or be able to afford the harsh civil sanctions imposed by HB 663 for any speech that transgresses the broad confidentiality and nondisclosure requirements of HB 663. Even the <u>threat</u> of punitive damages and attorneys' fees will have a tremendously chilling effect on such speech.

107.    Among the most harmful of many harmful effects of HB 663 is that by withholding information necessary to inform public discourse, it exempts the merits of capital punishment by lethal injection from further meaningful consideration. The law will thus arrest the public debate on the merits of capital punishment, artificially suspending the evolving standards of decency that must inform the use of capital punishment in any civilized society. <u>See, e.g.</u>, <u>Snyder v. Phelps</u>, 131 S. Ct. 1207, 1215 (2011) ("The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.' Accordingly, 'speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'").

**I. Another Purpose of HB 663 is to Purportedly Enable the State to Conduct Phillips's Execution as Scheduled, and Without Further Delay, on February 11, 2015.**

108.    Also motivating the adoption of HB 663 is the purported purpose to conduct Phillips's execution as scheduled, and without delay, on February 11, 2015, and to also avoid

further delay with other executions already scheduled to occur after Phillips's execution, including those of Tibbetts and Van Hook.

109.    The intention to proceed with Phillips's execution as scheduled in February 2015 is one reason HB 663 was hurried through the legislature on a fast-track schedule during the lame duck session of the 130th General Assembly, a session which ended on December 18, 2014.

110.    Public statements made in support of HB 663 by individual legislators and by other elected officials who were principal and visible supporters of the bill urged the bill's passage based upon the representation that Phillips's execution on February 11, 2015, and other scheduled executions after his would not be able to go forward without the confidentiality and secrecy provided by the bill.

111.    Rep. Huffman was reported as saying the bill "would encourage drug companies to get back on board." "The folks from [DRC] have said that they don't think they can get vendors to do it unless there is some anonymity," Huffman said. "If we're going to do executions, this has to be done." Payton Guion, "Ohio lawmakers want to remove transparency on executions, so capital punishment can resume," Vice News (December 2, 2014).[21]

112.    Attorney General DeWine made public statements in support of HB 663 that Phillips's execution in February 2015 would not be able to proceed without the prior passage of HB 663.  "You're not going to see a death penalty take place until the General Assembly takes action," DeWine was quoted as saying. Alan Johnson, "DeWine: Executions on hold until legislators change law," Columbus Dispatch (September 30, 2014).[22] DeWine has also been quoted

---

[21]Available at https://news.vice.com/article/ohio-lawmakers-want-to-remove-transparency-on-executions-so-capital-punishment-can-resume.

[22]Available at http://www.dispatch.com/content/stories/local/2014/09/30/dewine-executions-on-hold-until-legislators-change-law.html.

in support of the bill saying that, without the secrecy and anonymity provided to the drug makers and others by HB 663,  "[DRC] tells us it would be unlikely it (an execution) would proceed." Alan Johnson, "No executions until legislature acts," Columbus Dispatch (November 8, 2014).[23]

113.    Ron O'Brien, the Franklin County Prosecutor and a key supporter of the law, made similar public statements, including: "These convicted killers have been through the courts, some for decades, and their convictions and sentence have been upheld," O'Brien said. "Otherwise, they might as well outright repeal the death penalty because sentences imposed years ago and upheld in the courts after decades of post-conviction litigation will not be able to be carried out." Alan Johnson, "Proposal would make executions more secretive," Columbus Dispatch (October 2, 2014).[24]

114.    Ohio House Speaker William Batchelder, also a supporter of the law, explained that the law was needed to facilitate executions because "otherwise we're going to have people who pass away prior to execution." Jeremy Pelzer, "Death-penalty reform bill would protect execution drug makers, physicians who testify," Northeast Ohio Media Group (Nov. 10, 2014).[25]

115.    The "delays" to executions that HB 663 expressly seeks to avoid are those caused by speech that persuades those necessary to the execution process that, for whatever reason they find compelling, they should not participate in, and/or should withdraw their participation from, lethal injection executions.

---

[23]Available at http://www.dispatch.com/content/stories/local/2014/11/08/no-executions-until-legislature-acts.html.

[24]Available at http://www.dispatch.com/content/stories/local/2014/10/01/death_penalty _changes.html.

[25]Available at http://www.cleveland.com/open/index.ssf/2014/11/death-penalty_reform_bill_woul.html.

116.     HB 663 is concerned not only that such speech will delay the executions of Phillips and other inmates already with execution dates, including Tibbetts and Van Hook, but also that such speech may make it impossible for the State to carry out such executions by lethal injection at all.

117.     HB 663's solution to such speech is to stifle and suppress it, by making secret the identifying information of all such participants and former participants, and enforcing that secrecy with harsh and punitive civil sanctions, thereby ensuring that such participation is not withdrawn or refused.

### J. Plaintiffs Have Standing To Bring This Challenge.

118.     As a death row inmate whose timely execution motivated the hurried passage of HB 663, and whose execution is to be the first facilitated by the passage of the law, Phillips has been harmed and has sustained and/or will sustain palpable injury. He has standing to bring this challenge on that basis alone. So too do Tibbetts and Van Hook, both of whom also have imminent execution dates.

119.     In addition, all Plaintiffs have standing because the Challenged Provisions of HB 663 have the purpose and effect of suppressing speech in opposition to the death penalty and lethal injection, and of making such speech ineffective at reaching the intended audiences for such speech, and is thus directly harmful to Plaintiffs and other death row inmates and causes them actual and palpable injury. These effects are immediate upon the law's enactment and they will continue.

120.     The harm to Plaintiffs and other death row inmates is different in character from that sustained by the public generally as a result of the constitutional infirmities of the Challenged Provisions of HB 663.

121. The injury and harm to Plaintiffs includes the fact that the Challenged Provisions of HB 663 have the purpose and effect of attempting to conceal from Plaintiffs, and attempting to deny them access to, important documents and information, including identification information about drugs, compounders, pharmacists, suppliers, and execution participants. Plaintiffs' abilities to exercise their First Amendment rights to free speech and to petition for redress of grievances, including via the Ohio Lethal Injection Litigation, have thereby been substantially impaired.

122. The Challenged Provisions of HB 663 also deprive Plaintiffs and those speakers opposed to capital punishment, and who do not want Plaintiffs' executions to occur, of a meaningful opportunity to direct their speech towards persuading those persons who most need to hear that message for it to be of any consequence: those supplying the drugs or the professional medical expertise. Without any protection for the expression of the minority viewpoint, the only opinions on capital punishment to which those participating in lethal injections are guaranteed exposure are those the State believes will not interfere with its preferred method of execution. Ohio seeks to shield these individuals from hearing speech it deems undesirable because that speech is against the State's favored viewpoint.

123. The Challenged Provisions of HB 663 also harm Plaintiffs in their capacity as intended beneficiaries of the speech HB 663 unconstitutionally targets for suppression. The speech that is being stifled by the Challenged Provisions of HB 663 would directly and/or indirectly benefit Plaintiffs, and, at least as to some such speech, is intended by the speakers to directly and/or indirectly benefit Plaintiffs.

124. Because they suppress such speech against the death penalty and lethal injection, the Challenged Provisions of HB 663 make it more likely that Plaintiffs' executions will occur, and less likely that they will be stayed or that the death sentences will be reprieved or abandoned due to speech which has proven persuasive and/or been effective in the recent past. The Challenged

46

Provisions of HB 663 also make it more likely that the executions will occur in an environment where those commercial actors (drug makers, pharmacists, doctors, nurses, etc.) who have chosen to participate in the executions by supplying the drugs or medical expertise, in contravention of their ethical duties or professional or industry standards, have been shielded from hearing speech that challenges such involvement and encourages abstention from such involvement in the interest of morality, humanity, compassion, mercy, and professional standards or ethics.

125.    The Challenged Provisions of HB 663 also make it more likely that the executions will occur in an environment of lawlessness, when those who are violating federal and/or state laws through their actions have been protected from having their illegal activity reported to federal and/or state enforcement agencies or authorities, and thus protected from any consequence from their lawless actions that would otherwise likely result in significant civil or criminal sanctions.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – HB 663 Violates the Free Speech Provisions of the Ohio and U.S. Constitutions by Impermissibly Burdening Speech)**

126.    Plaintiffs incorporate by reference each and every statement and allegation set forth in all other paragraphs and sections of this Complaint as if fully rewritten here.

127.    The First Amendment, "above all else . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dep't of Chi. v. Mosley, 408 U.S. 92, 95–96 (1972) (citing Cohen v. California, 403 U.S. 15, 24 (1971); Street v. New York, 394 U.S. 576 (1969); New York Times Co. v. Sullivan, 376 U.S. 254, 269-70 (1964), and cases cited; NAACP v. Button, 371 U.S. 415, 445 (1963); Wood v. Georgia, 370 U.S. 375, 388-89 (1962); Terminiello v. Chicago, 337 U.S. 1, 4 (1949); De Jonge v. Oregon, 299 U.S. 353, 365 (1937). The Supreme Court has reemphasized this long-standing "guiding First

Amendment principle" on several recent occasions.  E.g., McCullen v. Coakley, 134 S. Ct. 2518, 2529 (2014) (citing Mosley, *supra*); Brown v. Entm't Merchs. Ass'n, 131 S. Ct. 2729, 2733 (2011) (citing Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)).

128.    "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 643 (1994).

129.    "Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when government seeks to orchestrate public discussion through content-based mandates." United States v. Alvarez, 132 S. Ct. 2537, 2550 (2012).

130.    "[T]he Constitution 'demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality.'" Id. (quoting Ashcroft v. American Civil Liberties Union, 542 U.S. 656, 660 (2004)).

131.    "In the realm of protected speech, the [state] legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue. If a legislature may direct business corporations to 'stick to business,' it also may limit other corporations -- religious, charitable, or civic -- to their respective 'business' when addressing the public. Such power in government to channel the expression of views is unacceptable under the First Amendment. Especially where, as here, the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." First Nat'l Bank v. Bellotti, 435 U.S. 765, 784-786 (1978). Indeed, laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles. United States v. Playboy Entm't Group, Inc., 529 U.S. 803 (2000).

132.    When a state action such as the Challenged Provisions of HB 663 "impose[] a restriction on the content of protected speech, it is invalid unless [the state] can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." Brown v. Entm't Merchs. Ass'n, 131 S. Ct. 2729, 2779 (2011). "That is a demanding standard. 'It is rare that a regulation restricting speech because of its content will ever be permissible.'" Id. (citing Playboy Entm't., 529 U.S. at 818). When state action affects First Amendment rights, interests to be protected "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." Id. (citing Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 546 (1993)).

133.    The Supreme Court has "emphatically rejected" the "startling and dangerous" idea that a state might claim for itself the power to "create new categories of" speech unprotected by the First Amendment "by applying a 'simple balancing test' that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test." Brown, 131 S. Ct. at 2734 (citing United States v. Stevens, 559 U.S. 460, 470 (2010)).

134.    The Challenged Provisions of HB 663 are unconstitutional on their face and/or as applied. They impose burdens that are based on the content of speech and that are aimed only at one particular viewpoint. The State is seeking to punish, disarm, suppress, and silence that viewpoint because it is opposed to its preferred viewpoint.

135.    The Challenged Provisions of HB 663 are content- and viewpoint-based because they draw distinctions on their face, and violations are dependent on the substance of what is said on prohibited topics or newly created categories of speech deemed by the law to be unprotected by the First Amendment.

136.    The Challenged Provisions of HB 663 are content- and viewpoint-based because they attempt to disable speech that has been effective in opposition to the State's favored

49

viewpoint. The force and effectiveness of speech cannot justify the State's attempt to stifle it. The State's failure, for example, to persuade the big-Pharma drug manufacturers and distributors to provide their drugs for executions does not allow the State to hamstring the opposition. The State may not burden speech of others in order to tilt the public debate in its preferred direction.

137.    As discussed throughout this Complaint, the Challenged Provisions of HB 663 are intended to unduly burden and will unduly burden the constitutionally protected speech of those opposed to capital punishment by lethal injection, including Plaintiffs. Each of the Challenged Provisions of HB 663 – **(1)** compelled secrecy; **(2)** disciplinary and licensure immunity for licensed professionals involved in lethal injection; **(3)** sealing of court records and a system of "private hearings"; and **(4)** civil sanctions for disclosure – have that improper purpose and effect, both individually and in combination.

138.    The Challenged Provisions of HB 663 are content-based and viewpoint-based restrictions on speech; the Challenged Provisions of HB 663 unduly burden speech on the basis of content and viewpoint.

139.    Because the Challenged Provisions of HB 663 are content- and viewpoint-based, they must be analyzed under strict scrutiny. The Challenged Provisions of HB 663 must be justified by a "compelling state interest" and they must be the least restrictive means for achieving that interest.

140.    The Challenged Provisions of HB 663 fail both of these requirements of strict scrutiny.

141.    The Challenged Provisions of HB 663 are not justified by any compelling state interest. The interests asserted by the State are neither compelling nor substantial.

142.    The State's interest in carrying out Plaintiffs' death sentences is not a compelling interest. See, e.g., Baze v. Rees, 553 U.S. 35, 58 (2008) (characterizing the interest as the "States'

legitimate interest in providing for a quick, certain death" (emphasis added)); Cooey v. Kasich, 801 F. Supp. 2d 623, 653 (S.D. Ohio July 8, 2011) (explaining that Ohio has no legitimate state interest in pursuing executions "at all or nearly all costs," and only a legitimate state interest in completing executions in a constitutional manner).

143.    One expressed purpose of the Challenged Provisions of HB 663 is to shield drug manufacturers, compounders, doctors, nurses, EMTs, and others who have voluntarily chosen to participate in lethal injections, and who are compensated for their participation, from speech by those who would seek to persuade such participants, at the key moments when the speech is most important, that their participation should be withheld on grounds of morality, religion, humanity, or professional or industry ethics or standards. But protecting citizens from unwelcome communications by other citizens on matters of immense public interest is never a compelling state interest. See, e.g., McCullen v. Coakley, 134 S. Ct. 2518, 2548 (2014) (Scalia, J., concurring in judgment, joined by Kennedy and Thomas, J.J.) ("'if protecting people from unwelcome communications'—the actual purpose of the provision—'is a compelling state interest, the First Amendment is a dead letter.'" (quoting Hill v. Colorado, 530 U.S. 703, 749 (2000) (Scalia, J., dissenting)); Snyder v. Phelps, 131 S. Ct. at 1219 (speech that is "upsetting" or "arouses contempt" is entitled to "'special protection' under the First Amendment . . . . 'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.'").

144.    And, although as a "sovereign" the State may well want to enforce a criminal judgment imposing the death penalty on, relatively speaking, a minor fraction of convicted criminals (there are some 130 people on death row in Ohio), that pursuit positively pales when compared to the venerated free speech rights held by all citizens enshrined in the state and federal constitutions.

145. A law which unduly burdens the free speech rights of citizens sharing a disfavored viewpoint with respect to an issue of immense public interest, on the asserted grounds that such law will supposedly make it a little bit easier for the "sovereign" to execute a handful of criminals, is not supported by any interest that can properly be considered "compelling" in any constitutional sense relevant here. Indeed, "administrative convenience" is not even a legitimate state interest in the context of an execution. Cooey, 801 F. Supp. 2d at 653 (citing Rinaldi v. Yeager, 384 U.S. 305, 310 (1966)).

146. Just as no compelling interest would enable the "sovereign" to silence students protesting Dow Chemical's production of napalm for use in the sovereign's war, and no compelling interest would allow the "sovereign" the power to silence pro-life advocates protesting abortions, no such interest empowers Ohio to silence citizens protesting the compounders, pharmacists, drug sources, and others who have chosen for their own commercial gain or other reasons to make the drugs for or otherwise participate in the sovereign's lethal injection executions. The same is true with participating physicians, nurses, EMTs, and other professionals.

147. Moreover, many of the asserted interests for HB 663 are pretexts for the improper purpose of suppressing an unwelcome viewpoint.

148. There is no history or tradition—let alone a long history or tradition—in Ohio of restricting speech against those persons and entities who have chosen, for their own personal, political, economic, or other reasons, and who are compensated for their participation, to supply drugs and other essential execution supplies or to otherwise perform professional services for purposes of lethal injection executions. To the contrary, in fact, there is a history of openness in Ohio's execution process.

149. Key participants have always been subject to public scrutiny and their identities never shielded, with the exception of some DRC employees actually on the execution team (for

52

whom existing protections, even if proper, are already sufficient without HB 663). For example, the identities of the following direct and indirect participants in Ohio's lethal injection executions have never been shielded but would be now under the Challenged Provisions of HB 663: **(i)** medical and other experts and consultants retained by the State; **(ii)** drug suppliers and pharmacists used by the State for securing the execution drugs; **(iii)** doctors, nurses, and mental health professionals conducting the required checks and assessments on an inmate in the minutes, hours and days leading up to an execution; **(iv)** doctors and nurses directly participating in executions (including, for example, the doctor who participated in Broom's attempted execution); **(v)** doctors assessing the inmate's status during an execution and pronouncing death; **(vi)** pharmacists, lawyers, and other professionals involved in providing the required periodic trainings and rehearsals for the execution team members; and **(vii)** many other direct participants in executions including DRC upper management personnel at levels below the director, DRC lawyers (e.g., during Broom's attempted execution), DRC's spokespersons and press officers, and the DRC employees who create the contemporaneous execution timeline for an execution or otherwise generate documents related to administration of the execution protocol.

150. It is only now as the death penalty has become more unpopular and fewer feel comfortable having a publicly known role in executions because of the possibility of "unwelcome communications" that Ohio has moved to shield the process in secrecy.

151. The Challenged Provisions of HB 663 are not justified by a compelling State interest. The Challenged Provisions of HB 663 are thus unconstitutional without regard to tailoring.

152. But the Challenged Provisions of HB 663 are not narrowly tailored either. The Challenged Provisions of HB 663, in each of its four key components, are not narrowly tailored. They are overinclusive because they are broader than necessary to accomplish the (less than

compelling) interests they purport to serve, and HB 663 will having a chilling effect on protected speech. Additionally, HB 663 is overinclusive because it purports to preclude enforcement action by federal licensing agencies or authorities such as the DEA or FDA, and to preclude speech that would alert those federal agencies to violations of federal law.  But that reach is too far, because it is well-settled constitutional law that a state legislature may not constitutionally nullify federal law or federal law enforcement efforts.

153.    The Challenged Provisions of HB 663 are also underinclusive "when judged against [their] asserted justification." Brown, 131 S. Ct. at 2740.  For instance, they do not include within the secrecy protections the Warden of SOCF and the Director of DRC. And these participants are not protected even though the Warden of SOCF—who plays an essential role in virtually every step of Ohio's execution protocol, including heading up the drug-procurement process, initiating the start of the injection of the lethal drugs, and standing directly over the inmate as the inmate is put to death—and the DRC Director—who is responsible for overseeing every execution, for ensuring strict adherence to the execution protocol, and for the contents of the execution protocol itself—are those for whom any alleged "threats" or "security risks" would be just as real as the (virtually non-existent) "threats" or "security risks" to others involved in executions in some way.

154.    Similarly, the Challenged Provisions of HB 663 are underinclusive because they purport to protect and shield from disclosure information about an expert retained by the State related to execution matters, and to immunize a State's expert from any professional sanctions, but an expert retained by an inmate-plaintiff is not afforded the same protection and immunization.

155.    Even if a State interest of some lesser degree than a compelling interest was the relevant standard, such lesser State interest does not justify the content- and/or viewpoint-based restrictions at issue here. The subject restrictions are not reasonable and necessary to serve any important public purpose.

156.    The Challenged Provisions of HB 663 and each of its four key components violate the First and Fourteenth Amendments of the U.S. Constitution and Article I, Section 11 of the Ohio Constitution.

### SECOND CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – the Challenged Provisions of HB 663 Constitute an Unconstitutional Prior Restraint on the First Amendment Rights of Plaintiffs and the Public)**

157.    Plaintiffs incorporate by reference each and every statement and allegation set forth in all other paragraphs and sections of this Complaint as if fully rewritten here.

158.    A "prior restraint" is the government's denial of access to a forum for expression before the expression occurs, requiring permission from the government to engage in constitutionally-protected expression. Incredible Investments, LLC v. Fernandez-Rundle, 984 F. Supp. 2d 1318 (S.D. Fla. 2013).

159.    A prior restraint on speech is the most serious and least tolerable infringement on First Amendment rights. Berger v. City of Seattle, 569 F.3d 1029 (9th Cir. 2009). As such, a prior restraint upon expression carries a heavy presumption of invalidity or unconstitutionality. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963); United States v. Quattrone, 402 F.3d 304 (2d Cir. 2005). Prior restraints have been accorded the most exacting scrutiny by the Supreme Court. Vance v. Universal Amusement Co., Inc., 445 U.S. 308 (1980).

160.    Only in exceptional cases, such as war, obscenity, and incitements to acts of violence and the overthrow by force of orderly government, is prior restraint on free speech permitted. In re Marriage of Meredith, 201 P.3d 1056 (Wash App. 2009) (citing Near v. Minn., 283 U.S. 697, 716 (1931)). The government has a heavy burden to establish that a particular restriction amounting to a prior restraint presents such an exceptional case. Davis v. East Baton Rouge Parish School Bd., 78 F.3d 920 (5th Cir. 1996).

161.    A system of prior restraint on expression avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. McKinney v. Alabama, 424 U.S. 669 (1976). Censorship is a form of infringement upon the freedom of expression to be especially condemned.  Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952).

162.    A prior restraint of speech cannot be upheld under the First Amendment unless justified by a compelling State interest to protect against a serious and identified threat of harm. See, e.g., Com. v. Barnes, 461 Mass. 644, 963 N.E.2d 1156 (2012).

163.    A prior restraint on speech that is premised merely on protecting business interests fails First Amendment scrutiny. Coulter v. Gerald Family Care, P.C., 964 A.2d 170 (D.C. App. 2009); see also Organization for a Better Austin v. Keefe, 402 U.S. 415, 420-21 (1971) (the interest of an individual in being free from public criticism of their business practices in literature distributed in the suburban neighborhood where that individual resides is not sufficient to support an injunction against peaceful distribution of such informational literature).

164.    The Challenged Provisions of HB 663 attempt to proscribe speech before it occurs and impose a prior restraint on protected expression, resulting in an unconstitutional effect on speech.

165.    The Challenged Provisions of HB 663 are and will have the effect of an unconstitutional prior restraint by keeping secret information that individuals and groups need to direct their speech, by imposing on speakers the explicit risk of civil actions and punitive damages for undesired speech, and by subjecting certain undesired speech to a system of "private hearings" in which the elevated burden of "clear and convincing evidence" and other rigorous requirements are imposed.

166.    The Challenged Provisions of HB 663 are and will have the effect of an unconstitutional prior restraint because they will prevent individuals from speaking out to reveal unlawful activity, or even activity that the speaker believes to be immoral, objectionable, or otherwise worthy of public discussion.

167.    The Challenged Provisions of HB 663 are and will have the effect of an unconstitutional prior restraint because they restrict would-be speakers from using information for protected purposes, such as peaceful assembly for a protest at the business or other lawful place of those protected persons engaged in activity the speaker finds objectionable.

168.    The Challenged Provisions of HB 663 are and will have the effect of an unconstitutional prior restraint by their establishment of a system of "private hearings" which require speakers, seeking information essential and relevant to protected speech on lethal injection, to first seek government approval in a judicial forum, and only upon a showing of "clear and convincing evidence" that the protected person "appears to have acted unlawfully with respect to the person's involvement in the administration of a lethal injection." R.C. §2949.222(C). But an execution participant's unlawful actions may be only part of the basis for a speaker wanting to speak about lethal injection—that restriction is not narrowly tailored to protect a speaker's interests in speaking about matters involving lethal injection that are not directly tied to the illegality of a participant's actions

169.    And, even if such a heightened evidentiary burden can be met, the information may in that event only be used for "discovery" and is still presumably subject to the confidentiality and non-disclosure provisions of HB 663. One of the sponsors of the bill described the regime established by the law under which some information may presumably become available for this very limited purpose and only if a prior determination of unlawfulness is made: "If needed to investigate any illegal activity conducted by a manufacturer and other entities involved, courts will

57

have access to the relevant information. That information would be under seal unless the court, after holding a private hearing with the Department of Rehabilitations and Corrections, finds an entity or individual acted unlawfully. Under that circumstance, the information would be subject to discovery."[26]

170.    The Challenged Provisions of HB 663 fail to include sufficient safeguards to obviate the dangers of a censorship system.

171.    The Challenged Provisions of HB 663 are not justified by a compelling State interest.

172.    Even if a State interest of some lesser degree than a compelling interest was the relevant standard, such lesser State interest does not justify the prior restraint on speech at issue here. The subject restrictions are not reasonable and necessary to serve any important public purpose.

173.    The Challenged Provisions of HB 663 and each of its four key components violate the First and Fourteenth Amendments of the U.S. Constitution and Article I, Section 11 of the Ohio Constitution.

## THIRD CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – the Challenged Provisions of HB 663 Violate Plaintiffs' Rights to Equal Protection and Due Process)**

174.    Plaintiffs incorporate by reference each and every statement and allegation set forth in all other paragraphs and sections of this Complaint as if fully rewritten here.

175.    The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.

---

[26]Available at http://www.cleveland.com/metro/index.ssf/2014/12/house_bill_663_helps_safe_guar.html.

amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." Id.

176. The Equal Protection Clause generally prohibits laws that impinge on fundamental rights, including freedom of speech.

177. When a statute is enacted based on improper motives, including animus towards a particular group, the Equal Protection and Due Process Clauses of the Fourteenth Amendment are violated. See, e.g., U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973).

178. The motivating purpose behind the Challenged Provisions of HB 663 was animus towards death row inmates including Plaintiffs, and those citizens who exercise free speech against executions by lethal injection, and to shelter those who participate in and assist the State in conducting such executions from the speech of their fellow citizens seeking to persuade such participants that their involvement is immoral, unjust, inhumane, and contrary to professional and/or industry standards/ethics.

179. That improper purpose is apparent from the purported "findings" that were part of the House version of the bill, House Version, § 2949.221(B), all of which either are factually devoid pretexts for targeting the undesired viewpoint or are expressed declarations for doing so.

180. The improper purpose is also apparent from public statements made by legislators. As reported in the media, legislators made statements that at least one purpose of HB 663 is to prevent protesting and picketing.

181. The Challenged Provisions of HB 663, in their purpose and effect, also violate the Equal Protection Clause because they treat similarly-situated persons differently. Those speakers opposed to capital punishment by lethal injection are treated differently than proponents. They are also treated differently than speakers who are similarly situated because they share a desire to engage in advocacy speech on controversial issues of public debate such as abortion. Anti-abortion

advocates are not rendered mute, unlike those opposed to capital punishment by lethal injection, because no state action has been taken to keep secret the identities, addresses, and other similar information of those with whom the speakers wish to engage in advocacy speech. Additionally, Plaintiffs are treated differently than speakers such as Defendants in this case who are similarly situated in the context of Lethal Injection Litigation, because Defendants' litigation experts are purportedly shielded from disclosure of their identity and immunized from any professional sanction, while Plaintiffs' litigation experts are not similarly protected.

182. Those speakers opposed to lethal injection are burdened in their expression in the application of the Challenged Provisions of HB 663, and their speech is restricted, in the many ways identified earlier in this Complaint and incorporated here. The Challenged Provisions of HB 663, in their purpose and effect, have a disparate impact on those speakers opposed to capital punishment by lethal injection.

183. These burdens have been imposed at least in part because of the legislative majority's fear that such speech in opposition to capital punishment by lethal injection will make it impossible for the State to conduct any more executions by lethal injection.

184. The application of HB 663 does not equally burden the speech of those who support capital punishment by lethal injection. For example, the provision providing for civil sanctions for disclosure of the identification information of protected persons disparately impacts those speakers who oppose capital punishment by lethal injection, but does not burden the speech of proponents. Speakers opposed to capital punishment are much more likely to seek the disclosure of such identification information, whereas those in favor of capital punishment would rarely if ever need or want to do so (especially when doing so is believed by them to impair the effectiveness of a policy they favor and seek to promote).

185.    The Challenged Provisions of HB 663 also treat speakers opposed to capital punishment by lethal injection differently than speakers on other controversial public policy issues, and which, like the death penalty, generate intensive public debate and spur speech.

186.    There are, for example, no legislative enactments in Ohio, and to the best of Plaintiffs' knowledge in any other states or in the federal government, which make confidential and bar from public disclosure and debate information about the identities of those who voluntarily and for compensation chose to make weapons for use in wars, or provide products and/or professional services in the performance of abortions.  Yet, Ohio has chosen to treat the death penalty, and consequently those under that sentence, differently than these other matters of intense public interest and debate, with no compelling grounds for doing so.

187.    The Challenged Provisions of HB 663 also violate the equal protection rights of Phillips, Tibbetts, and Van Hook on a "class of one" basis.

188.    The legislative majority intentionally, and without a compelling basis, treated Phillips, Tibbetts, and Van Hook, and other death row inmates whose execution dates occur before March 2016, the "sunset" date of HB 663, differently from all others death row inmates in Ohio.

189.    As addressed throughout this Complaint, this discriminatory treatment of Phillips, Tibbetts, and Van Hook, and other death row inmates with imminent dates, was intentionally directed and is not the result of an accident or a random act.

190.    The Challenged Provisions of HB 663 are not justified by any compelling interest, nor do they serve any rational, non-animus based purpose.

191.    Plaintiffs are entitled to prospective relief from Defendants to remedy these Equal Protection and Due Process violations.

## FOURTH CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – the Challenged Provisions of HB 663 Deprive Plaintiffs of Information that Would Enable Them to Determine How the State Intends to Execute Them, Thereby Denying Plaintiffs Their First Amendment Rights to Petition the Government for Redress of Grievances and of Meaningful Access to the Courts)**

192.    Plaintiffs incorporate by reference each and every statement and allegation set forth in all other paragraphs and sections of this Complaint as if fully rewritten here.

193.    Separate and apart from the statute's unconstitutionality as addressed in Count I and II of this Complaint, the Challenged Provisions of HB 663 deprive Plaintiffs of information that would enable them to determine how the State intends to execute them, thereby also denying Plaintiffs their First Amendment rights to petition the government for redress of grievances and of meaningful access to the courts.

194.    The First Amendment right to petition the government for redress of grievances includes the right of access to the courts.

195.    State action that denies a plaintiff the opportunity to litigate gives rise to a claim that the State is violating the plaintiff's right of access to the courts. The right of access to the courts is an ancillary claim, which is necessary for the vindication of underlying rights.

196.    By concealing critical information about the specific drugs the State intends to use to execute Plaintiffs, including identifying information about the drug makers and their qualifications, credentials, competence, and reputation, the Challenged Provisions of HB 663 have erected a condition that frustrates Plaintiffs' ability to fairly and effectively litigate their claims relating to the constitutionality of their executions by lethal injection.

197.    This frustrating condition deprives Plaintiffs of their First Amendment rights to petition the government for redress of grievances. This frustrating condition also deprives Plaintiffs of their due process rights of access to the courts.

198.    The Challenged Provisions of HB 663 that result in the concealment of information that would enable Plaintiffs to determine how the State intends to carry out their executions by lethal injection — including documents and information relating to the lethal injection drugs, the authority of the drug makers and DRC to handle controlled substances, the legality or illegality of the manufacture and use of compounded drugs (and compounded pentobarbital in particular) in the execution context, the qualifications, credentials, competence, protocols, and reputation of the drug makers and other professionals involved in the execution such as any analytical testing laboratories upon which Defendants may rely to assert that any compounded execution drugs are acceptable to use — denies Plaintiffs their rights not to be deprived of their lives without due process of law.

199.    The Challenged Provisions of HB 663's compelled concealment of such information deprives Plaintiffs of their ability to determine whether the State is capable of carrying out their executions by lethal injection in a lawful, constitutional manner.

## FIFTH CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – the Challenged Provisions of HB 663 Deny Plaintiffs and the Public Their First Amendment Rights of Access to Governmental Proceedings)**

200.    Plaintiffs incorporate by reference each and every statement and allegation set forth in all other paragraphs and sections of this Complaint as if fully rewritten here.

201.    Separate and apart from the statute's unconstitutionality as addressed in Counts I and II of this Complaint, the Challenged Provisions of HB 663's concealment of information as to how the State intends to carry out Plaintiffs' executions by lethal injection — including documents and information relating to the lethal injection drugs, the authority of the drug makers and DRC to handle controlled substances, the legality or illegality of the manufacture and use of compounded drugs (and compounded pentobarbital in particular) in the execution context, the qualifications,

credentials, competence, protocols, and reputation of the drug makers and other professionals involved in the execution such as any analytical testing laboratories upon which Defendants may rely to assert that any compounded execution drugs are acceptable to use — denies Plaintiffs and the public their First Amendment rights of access to governmental proceedings.

202.    The First Amendment guarantees the public — and the press — a qualified right of access to governmental proceedings. Underlying this right "is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 604 (1982) (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)). This protection ensures "that the individual citizen can effectively participate in and contribute to our republican system of self-government." Id.

203.    There is a public right of access to view an execution by lethal injection including all procedures inextricably intertwined with putting the inmate to death.  This right of access also includes the right of access to documents intrinsically associated with the execution, including, in the context of executions by lethal injection, documents relating to the lethal injection drugs, the authority of the drug makers and DRC to handle controlled substances, the legality or illegality of the manufacture and use of compounded drugs (and compounded pentobarbital in particular) in the execution context, the qualifications, credentials, competence, protocols, and reputation of the drug makers and other professionals involved in the execution such as any analytical testing laboratories upon which Defendants may rely to assert that any compounded execution drugs are acceptable to use.

204.    This public right of access has constitutional protection because both of the following are true with respect to the right of access to executions: **(a)** executions and associated documents and information have historically been open to the press and general public, in Ohio and in other states; and **(b)** the public access plays a significant positive role in the functioning of

64

the execution process. <u>See generally</u> <u>Press-Enterprise Co. v. Superior Court</u>, 478 U.S. 1, 10-13 (1986).

205.     An informed public debate is critical in determining whether a specific execution method comports with this country's evolving standards of decency, and even more so at this time in history where, for reasons addressed throughout this Complaint, there is intense public interest in whether lethal injection is capable of being administered in a humane manner.

206.     Given the factual backdrop of the many recent botched executions and the unavailability of execution drugs manufactured by the companies of big-Pharma, more information about the drugs used in lethal injections can help an alert public make more informed decisions about the evolving standards of decency in this country surrounding lethal injection. Knowing the source of the drugs, and the qualifications, credentials, competence, protocols, and reputation of the drug makers and other professionals involved in the execution process, among other information, allows the public to discern whether Defendants are using safe and reliable drug manufacturers, and would give the public the basic confidence, beyond the State's generic assurances, that executions will be administered safely and pursuant to certain qualifications and standards.

207.     The Challenged Provisions of HB 663's concealment of all such identifying information, and more, deprives Plaintiffs and the public of their First Amendment right to be informed about how the State intends to implement the most serious punishment possible: the penalty of death.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A. For a declaration that the Challenged Provisions of HB 663 – **(1)** compelled secrecy; **(2)** disciplinary and licensure immunity for licensed professionals involved in lethal injection; **(3)** sealing of court records and a system of "private hearings"; and **(4)** civil sanctions for disclosure – , which are found in Ohio Rev. Code §§ 149.43, 2949.221, and 2949.222, are unconstitutional on their face and/or as applied, are invalid, and/or may not take effect;

B. For a declaration that the compelled secrecy provisions of HB 663, which are found in Ohio Rev. Code §§ 149.43, 2949.221, and 2949.222, are unconstitutional on their face and/or as applied, are invalid, and/or may not take effect;

C. For a declaration that the provisions of HB 663 providing for disciplinary and licensure immunity for licensed professionals, individuals, or entities involved in lethal injection executions, which are found in Ohio Rev. Code §§ 2949.221, and 2949.222, are unconstitutional on their face and/or as applied, are invalid, and/or may not take effect;

D. For a declaration that the provisions of HB 663 providing for the sealing of court records and the system of "private hearings," which are found in Ohio Rev. Code §§ 2949.221, and 2949.222, are unconstitutional on their face and/or as applied, are invalid, and/or may not take effect;

E. For a declaration that the provisions of HB 663 providing civil sanctions for disclosure, which are found in Ohio Rev. Code §§ 2949.221 and 2949.222, are unconstitutional on their face and/or as applied, are invalid, and/or may not take effect;

F.     For a permanent, preliminary, and temporary injunction enjoining the effectiveness of the Challenged Provisions of HB 663 and/or enjoining Defendants from enforcing the Challenged Provisions of HB 663, including its provisions allowing for compelled secrecy, disciplinary and licensure immunity for licensed professionals, individuals or entities involved in lethal injection, the sealing of court records and the system of "private hearings," and civil sanctions for disclosure;

G.     For such costs and reasonable attorneys' fees to which Plaintiffs might be entitled at law; and

H.     For such other and further relief in Plaintiffs' favor as the Court may deem just and proper.

Dated: December 23, 2014              Respectfully Submitted,

<table>
<tr><td>/s/ Timothy F. Sweeney</td><td>/s/ Lisa M. Lagos</td></tr>
<tr><td>Timothy F. Sweeney, Esq.  (0040027)<br>LAW OFFICE OF TIMOTHY FARRELL SWEENEY<br>The 820 Building<br>820 West Superior Ave., Suite 430<br>Cleveland, Ohio   44113-1800<br>216-241-5003<br>216-241-3138 (fax)<br>Email: tim@timsweeneylaw.com<br><br>Counsel for Plaintiffs Phillips and Brinkley</td><td>Lisa M. Lagos (0089299)<br>Assistant State Public Defender<br>Office of the Ohio Public Defender<br>250 E. Broad Street<br>Suite 1400<br>Columbus, Ohio   43215<br>614-466-5394<br>614-728-3670 (fax)<br>Email: Lisa.Lagos@opd.ohio.gov<br><br>Counsel for Plaintiff Phillips</td></tr>
<tr><td>/s/ Allen L. Bohnert</td><td>/s/ John P. Parker</td></tr>
<tr><td>Allen L. Bohnert (0081544)<br>Sharon Hicks (0076178)<br>Office of the Federal Public Defender<br>for the Southern District of Ohio<br>Capital Habeas Unit<br>10 West Broad Street, Suite 1020<br>Columbus, OH 43215</td><td>John P. Parker (0041243)<br>Attorney at Law<br>988 East 185th Street<br>Cleveland, Ohio   44119<br>(216) 881-0900<br>Email: johnpparker@earthlink.net</td></tr>
</table>

614-469-2999                                    Counsel for Plaintiff Brinkley
614-469-5999 (fax)
Email: Allen_Bohnert@fd.org
Email: Sharon_Hicks@fd.org

Counsel for Plaintiffs Tibbetts and/or Van
Hook